**Gordon McMAHON, Plaintiff,**

v.

**NEW CASTLE ASSOCIATES, Pan American Associates; Richard I. Rubin & Company; and Richard I. Rubin & Co., Inc., Defendants.**

**Civ. A. No. 87–526–JRR.**

United States District Court,
D. Delaware.

May 26, 1988.

See also 532 A.2d 601.

tan, Malakoff & Meyers, P.C., Pittsburgh, Pa., of counsel), for plaintiff.

Edward M. McNally and Mary M. Johnston of Morris, James, Hitchens & Williams, Wilmington, Del. (Michael S. Silberman of Silberman & Raslavich, Philadelphia, Pa., of counsel), for defendants.

## OPINION

ROTH, District Judge.

### I. INTRODUCTION AND FACTS.

This case is before the Court on defendants' motion to dismiss Counts I, II and IV (to the extent it relates to Counts I and II) of the Complaint. As both parties have submitted matters outside the pleadings, the motion to dismiss shall be treated as one for summary judgment under Rule 56 of the Federal Rules of Civil Procedure. *See* Fed.R.Civ.P. 12(b). Following are the facts as construed in a light most favorable to the non-moving party.

Plaintiff is Gordon McMahon, owner of a book store located in the Christiana Mall in Newark, Delaware. Defendants are: New Castle Associates, the mall owner, a Pennsylvania limited partnership; its general partner, Pan American Associates; Richard I. Rubin & Company, general partner of Pan American; and the mall management company, Richard I. Rubin & Co., Inc. Defendants are hereinafter referred to collectively as "the Mall" or "the Landlord." Plaintiff alleges in this suit that the Mall has been profiting unlawfully from its resale of electricity to the Mall tenants, including plaintiff.

McMahon has been a tenant in the Mall since it opened in 1978 and has recently exercised a renewal option on its lease for a term of five years. The Lease provides in § 1302 that if the Landlord determines to furnish lighting, power, cooling and heating, tenant agrees to pay additional rental in accordance with an "Energy Rent Inclusion Schedule." The Energy Rent Inclusion Schedule provides in ¶ IA:

> Landlord agrees to furnish electrical service to the Demised Premises for the use of the Tenant, to the extent provided in this Schedule, *without separate charge*

Robert K. Payson, John E. James and Richard L. Horwitz of Potter, Anderson & Corroon, Wilmington, Del. (Michael P. Malakoff and Fred S. Longer of Berger, Kape-

*therefor to Tenant by metering or otherwise,* the total charge for such electrical service as hereinafter to be added to the Annual Minimum Rent reserved in the lease.

Lease Exhibit F, ¶ IA (emphasis added).

Paragraph 1803 of the Lease requires the Tenant to pay its share of the "Shopping Center's Annual Operating Cost of the Common Areas and Facilities," including the Mall's cost of operating, maintaining and repairing the Heating, Ventilating and Air Conditioning equipment servicing the common areas. This is known as the common area maintenance charge ("CAM" charge).

The tenants receive monthly invoices from the Mall in which rent and utilities are separately listed. The monthly minimum rent is negotiated at the beginning of the lease term and is fixed. The electrical utility charges fluctuate; the Mall determines the tenant's electrical bill according to the recommendation of an energy consultant who estimates the tenant's electrical usage.

## II. VIOLATION OF THE DELAWARE LANDLORD/TENANT CODE.

At issue in Count I is a provision of the Delaware Landlord Tenant Code, 25 *Del. C.* § 5114, which became effective on July 9, 1981:

> § 5114. Metering and charges for utility services.
>
> (a) A landlord who is the customer of a public utility which provides various utility services in bulk to the landlord may install, operate and maintain meters or other appliances for measurement to determine the consumption of such utility services by each rental unit. Only if the rental agreement so provides, and in compliance with this section, may a landlord charge a tenant separately for the utility services as measured by such meter or other appliance.
>
> (b) A landlord who charges a tenant separately for utility services shall not charge or receive from tenants an amount for such utilities which exceeds the lesser of:

> (1) The charge which would be paid if the tenant were a direct customer of the public utility; or
>
> (2) The proportionate share of the bulk billing payable by the landlord, based upon the measurement in accordance with subsection (e) of this section.

Plaintiff interprets § 5114(a) to mean that only landlords who elect to comply with § 5114(a) and individually meter are permitted to charge tenants separately for electricity. Further, plaintiff contends that § 5114(b) is applicable to the Mall and that the Mall has been charging for electricity in excess of the amounts permitted in that section. Defendants argue that § 5114 is permissive and applicable only to landlords that choose to meter tenants individually. Since the Mall does not individually meter, defendants reason, compliance with 5114(b) is not required.

### A. *The Provident Decision.*

A recent Delaware Superior Court case has construed § 5114. *Provident Life and Accident Insurance Co. v. Permott–East,* C.A. No. 85C–AU–10–15 slip op. (Del.Super. Nov. 20, 1987) [available on WESTLAW, 1987 WL 25486], *reargument denied,* C.A. No. 85C–AU–10–15 (Del.Super. Feb. 11, 1988) [available on WESTLAW, 1988 WL 15371]. In *Provident,* plaintiff, the landlord of the Dover Mall, sued defendant tenants for the unpaid electricity portion of the utility charges made in accordance with tenants' leases. While the applicable provision of the leases is not reproduced or described at length, the leases apparently provided for utility charges as "additional rental." Defendants argued that this separate charge subjected the landlord to § 5114(b) and that the leases' method of fixing charges was in violation of this section. Judge Bush held that:

> Subsection (a) clearly requires that a landlord need only comply with section 5114 when he seeks to "charge a tenant separately for the utility services as measured by such meter or other appliance." 25 *Del. C.* § 5114(a).... Despite the fact that later subsections refer only to a landlord who "charges separately for

utility services" without the modification seen in subsection (a), to ignore subsection (a)'s definition of the regulated activity would contravene legislative intent. Therefore, only a landlord purchasing bulk power, who chooses to install individual meters, need meet the requirements of 25 *Del.C.* § 5114.

### B. *Prediction of How the Delaware Supreme Court Would Interpret § 5114.*

■ We have not been referred to any Delaware Supreme Court case interpreting § 5114. Our task then is to determine how the Delaware Supreme Court will interpret § 5114. *Valley Forge Insurance Co. v. Jefferson*, 628 F.Supp. 502, 510 (D.Del. 1986). In so doing, we are not compelled to follow the decisions of lower state courts. *Id.* at 505. Such decisions should be viewed only " 'as indicia of how the state's highest court might decide.' " *id.* (*quoting Pennsylvania Glass Sand Corp. v. Caterpillar Tractor Co.*, 652 F.2d 1165, 1167 (3d Cir.1981)). Also cogent in predicting how the Delaware Supreme Court will decide an issue are " '[t]he policies underlying the applicable legal doctrines, the doctrinal trends indicated by these policies and the decisions of other courts....' " *Id.*

### 1. *The Language of the Statute.*

■ The starting point for any statutory analysis is the language of the statute itself. The first sentence of Section 5114(a) provides that "[a] landlord ... *may* install, operate and maintain meters...." (emphasis added). This language plainly indicates that metering is optional. As to this finding, we agree with *Provident* and predict that the Delaware Supreme Court would agree as well.

Turning to § 5114(b), the statutory language is ambiguous. Subsection (b) begins: "A landlord who charges separately for utilities shall not...." As subsection (a) applies only to landlords who individually meter, it is possible to read this limitation into subsection (b) as did the court in *Provident.*

Viewing § 5114 as a whole, however, we find the *Provident* interpretation to be mis-

calculated. The section operates as a general regulation of landlords' obligations in setting and passing on utility charges. The section is replete with tenant protections. To name a few: (1) the tenant is entitled to inspect bills and records for utilities (§ 5114(c)); (2) a landlord is not permitted to discontinue utility service for non-payment of rent (§ 5114(d)); and (3) a landlord charging separately for utilities shall bill the tenant for such charges at least monthly (§ 5114(e)). Given that the very language of the section evidences its mission is to protect tenants, it would be anomalous to conclude that a landlord, who charges an amount which fluctuates with a tenant's use of electricity, could opt out of the section simply by not installing separate meters.

### 2. *Regulatory Antecedents.*

The regulatory antecedents of § 5114 foster an interpretation that it should be read broadly to regulate all landlords who charge separately for utilities through metering or otherwise. Prior to the promulgation of § 5114, the Delaware Public Service Commission (the Delaware "P.S.C."), issued Tariffs prohibiting the resale of electricity. The June 12, 1980, Tariff stated at Section XI, ¶ A:

*The Customer shall not directly or indirectly sell, sublet, assign or otherwise dispose of the electric energy* or any part thereof except that this rule shall not apply to a public utility, as defined by the laws of the State of Delaware, purchasing electric energy in bulk for distribution to its Customers. *Purchase of energy in bulk for use by tenants located on the Customer's property when the cost to the tenant of such energy is included in normal rental charge for occupancy of the premises, shall not be considered as resale.*

Plaintiff's Exhibit C, Section XI, ¶ A (emphasis added). This Tariff was in effect at the outset of McMahon's lease term. Indeed, the Tariff provision prohibiting the resale of electricity has been in effect since at least 1962. *See*, Plaintiff's Exhibit E at ¶ 11-a (a 1962 Tariff forbidding electricity resale).

Consistent with P.S.C. Tariffs, in 1955, the Delaware P.S.C. denied landlords permission to submeter their tenants and to resell electricity. *Tweed v. Delaware Power and Light Co.*, 11 P.U.R.3d 226 (1955), *aff'd,* 11 P.U.R.3d 239 (Del.Super.1955). The Commission held:

> Regulations may, however, be adopted which prohibit the resale of electricity altogether. The submeterer would act, in effect, as a public utility in selling to current tenants, and yet be entirely free from any restraint or regulation. *This might lead to a situation where the middleman could charge exorbitant rates to the customer. Prohibiting resale protects the consumer from excessive rates; and protects the power company from a possible loss of revenue to over-eager middlemen.*

*Id.* at 232 (emphasis added). The P.S.C. was obviously concerned that landlords who charged their tenants separately for electricity would charge excessively for the electricity sold, the same concern reflected in the Tariffs, *supra.*

### 3. *Federal Policy.*

The legislative concerns of the federal government also persuade us that § 5114(b) should be applied to any landlord who separately charges for electricity. In November, 1978, the federal government established regulatory policies for electric utilities in an Act entitled Public Utility Regulatory Polices Act of 1978 ("PURPA"), 16 U.S.C. § 2601 *et seq.* Among the enumerated purposes of PURPA was to promote conservation and equitable rates to consumers. To those ends, Congress set forth several standards which the states were to consider and to incorporate in their own utility regulations by November 9, 1981. 16 U.S.C. § 2622(b)(2). Two of the standards to be established concerned the cost of service and the curtailment of master metering:

> Rates charged by any electric utility for providing electric service to each class of electric consumers shall be de-

signed, to the maximum extent practicable, *to reflect the costs of providing electric service to such class,* as determined under section 2625(a) of this title. § 2621(d)(1) (emphasis added); and

> To the extent determined appropriate under section 2625(d) of this title, master metering of electric service in the case of new buildings shall be prohibited or restricted to the extent necessary to carry out the purposes of this chapter.

§ 2623(b)(1).

Plaintiff submits that these two standards are embodied in § 5114 and we agree. Although we have not been referred to any explicit support that § 5114 was adopted in response to PURPA, it is reasonable to infer a relationship between the PURPA mandates and § 5114. First, we note that § 5114 was promulgated on July 9, 1981, thereby closely preceding the federal deadline of November 9, 1981. 16 U.S.C. § 2622(b)(2). Second, the actions of the Delaware P.S.C. in response to PURPA solidify the link between that federal statute and § 5114.

In April, 1980, the Delaware P.S.C. held a hearing to consider the PURPA guidelines and to determine how they should be incorporated into the Delaware Regulatory Scheme. *See, In the Matter of the Considerations of the Federal Standards Established by Section 113 of the Public Utility Regulatory Policies Act of 1978 and Other Tariff Changes Filed by Delmarva Power & Light Company on December 10, 1979,* P.S.C. Reg. No. 2, Defendants' Exhibit H; and *P.S.C. Findings, Opinion and Order,* No. 2051 (April 8, 1980). Plaintiff's Exhibit I. On the question of resale of electricity, the Hearing Examiner recognized that the P.S.C.'s position had long been to condemn the resale of electricity by landlords.[1] However, he recognized that some system was needed to encourage energy conservation by tenants. Delmarva suggested that the Tariff prohibiting resale be amended to permit submetering. The Hearing Examin-

---

**1.** As we note earlier, Delaware had a Tariff in place prohibiting the resale of electricity by landlord's for profit in 1962.

er rejected that approach because of the implications for the landlord/tenant relationship which was not a traditional part of the P.S.C.'s jurisdiction. Thus, he concluded that the Tariff restriction on resale should remain in effect, based on the P.S. C.'s longheld policy, and that any effort to change this situation in the landlord/tenant context be committed to the General Assembly:

95. How then is the Commission to deal with these existing situations, some of which can be separately metered and others of which cannot, within the realm of economic feasibility? Should billing systems be permitted as an exception to the existing resale prohibition which now states that the purchase of energy in bulk for use by tenants located on the customer's property, when the cost to the tenant of such energy is included in normal rental charge for occupancy of the premises, shall not be considered as resale?

97. I believe there are many benefits which would flow from resale by submetering or otherwise. *However, the vast majority of the problems involve the landlord/tenant relationship and should be dealt with in laws governing that relationship.*

98. *The Commission could accept the proposal of the Company and permit the resale and submetering of electricity and, thereby, reverse its previous position.... However, I do not believe it would be in the public interest for the Commission to do so at this time.* I suggest that it serves no useful purpose to proceed before the Commission, rather these matters, to be effectively resolved, should receive immediate legislative attention through modification of the existing landlord/tenant code. The existing tariff provision prohibiting resale of electricity should be preserved and the tariff modification proposed by the Company should be rejected. *Only in this way, will the General Assembly have the timely opportunity to set forth in the landlord/tenant code, appropriate safeguards which the Commission has neither jurisdiction nor expertise to estab-*

*lish, for both landlords and tenants,* and to provide which, if any, practices shall not be deemed to constitute resale of utility service purchased from a public utility, or which, if any, practices shall not be deemed to constitute resale of utility service purchased from a public utility, or which, if any, practices are to be specifically authorized by law. *For the Commission to accept the Company's proposal prior to action by the legislature, would perhaps foster the national policies of conservation and equitable electric rates, but would also give rise to a series of problems for both landlords and tenants,* which the Commission has no authority to resolve.

Plaintiff's Exhibit H at ¶ 95 and 97–98 (emphasis added).

In its Order, the P.S.C. affirmed the Hearing Examiner's decision and concurred that the matter should be directed to the General Assembly:

18. While we have adopted the findings and conclusions of the Hearing Examiner which favor the continuation of the existing prohibition against the resale of electricity, we have done so reluctantly. We agree with the Hearing Examiner that there are benefits in terms of energy conservation which can flow from resale if properly controlled. However, *to remove the existing resale prohibition without first having addressed the problems that will result from such action, inevitably gives rise to difficulties in the landlord/tenant area over which the Commission has neither expertise nor authority. The Hearing Examiner suggests this matter is appropriate for legislative consideration to develop the safeguards deemed necessary for both landlords and tenants prior to permitting submetering or resale. Therefore, while we have retained the existing prohibition,* we will participate with the Office of the Public Advocate, other interested state agencies, and interested landlord and tenant groups or associations in preparing legislation which would address this problem by modifying the landlord/tenant law.

Plaintiff's Exhibit I at ¶ 18 (emphasis added).

The above reinforces our conclusion that 25 *Del.C.* § 5114 was the progeny of the already existing P.S.C. policy against resale and of the new federal guidelines. Section 5114 and an August 10, 1981, Tariff (Plaintiff's Exhibit F, ¶ A)—which adopted Chapter 51 of Title 25, of which § 5114 is part and as such is the only exception to the prohibition of reselling electric energy—evidence a deliberate plan of the Delaware General Assembly and the P.S.C. to fashion a legislative solution that would continue the prohibition against landlord profits on resale but would also permit landlords to pass through the increased costs of utilities to tenants by submetering. Section 5114 met the federal policy of discouraging master metering while maintaining the long standing policy in Delaware against resale for profit.

Defendants argue against this interpretation by pointing out that under § 5114 a landlord may choose not to meter his tenants and thereby be free of any regulations regarding electricity resale. This is true in a situation where a fixed rent is set for the term of the lease and the tenant in signing the lease is aware of what will be charged each month. However, we have come to the conclusion that defendants' reading of § 5114 applies only to a lease which provides for a fixed monthly rent and not to a monthly "rent" payment by a tenant, which payment will fluctuate in accord with the amount of electricity that tenant consumes.

We, therefore, predict that unlike the *Provident* court, the Delaware Supreme Court would interpret § 5114(b) to harmonize with federal and state regulatory policy which has uniformly been to prevent landlord profiteering on the resale of electricity. The inevitable interpretation of § 5114(b) which results when this policy is embraced is that § 5114(b) is applicable to *any* landlord who separately charges by metering or *otherwise*.

C. *What Constitutes Charging Separately.*

■ Given that § 5114(b) is applicable to any landlord who separately charges, we must then deal with the question of whether the Mall charges McMahon "separately." As the purpose of § 5114 is to guard against landlord profiteering from utility charges, any payment required under a lease, which payment purports to approximate actual utility costs, must be viewed as a "separate charge." In other words, whether such a charge is called "rent" or whatever, a charge for a utility must be regarded as a separate charge whenever the language of the lease contemplates that the utility payments will be commensurate with and fluctuate with actual usage.

■ The facts of this case as viewed in the light most favorable to plaintiff, McMahon, clearly evidence that the utility charges would be separate and commensurate with usage. The lease itself, in the "Energy Rent Inclusion Schedule," provides that rent shall be increased by the Electrical Inclusion Factor "to *compensate* the Landlord for supplying Tenant with electrical service...." Further the utility charge is itemized separately on each monthly invoice. *McMahon Affidavit*, Exhibit C. While it is true that the lease terms characterize this charge as "additional rental" with "no separate charge" for utilities, this label does not negate the parties clearly expressed intent that this "additional rental" is in fact a charge for electricity consumed. While it is true that the tenant freely agreed to pay the "additional rent" there is no question under the present posture of this case that the expectation was that charges would be made to reflect usage. Based on the above, we conclude that the Mall separately charges for electricity consumed by plaintiff. A question of fact exists, therefore, as to whether the Mall has complied with the limitations of § 5114(b).

III. VIOLATION OF THE PUBLIC UTILITY TAX CODE.

■ Count II of plaintiff's complaint implicates 30 *Del.C.* § 5501 *et seq.* pertaining to public utility taxes. Section 5502, as amended, states in relevant part:

(b) A tax is imposed upon any *distributor* of gas, electricity, telegraph or cable television communication commodities and services which tax shall be at the rate of 4.25% of the gross receipts or tariff charges received by the distributor for such commodities or services distributed within this State.

(c) When the tax imposed by subsection (b) of this section applies to a distributor subject to the regulation of the Public Service Commission the Commission is directed, ... to adjust the tariff of such distributor so that the tax is, passed through pro rata to the distributor's customers and the distributor's earnings are neither increased nor decreased by such tax.

(emphasis added). Plaintiff alleges that the Mall purchases electricity from Delmarva Power at a wholesale rate, and in turn it charges tenants for electricity at a higher rate. The utility tax described is allegedly passed on by defendant to plaintiff at this higher rate. This method, according to plaintiff, allows the Mall to profit on the tax because it in turn pays a utility tax to Delmarva only on the wholesale rate. *See Plaintiff's Complaint* ¶ 46.

Although plaintiff charges that it is being assessed utility taxes based on an inflated utility bill, he has provided no explanation whatsoever as to how or when the tax is assessed. We are not directed to any part of the lease, its exhibits, the rental invoices or any other part of the record which indicates that plaintiff is being assessed any utility tax at all. We cannot, therefore, surmise, as plaintiffs would have us do, that the Mall is charging inflated taxes.

The parties have not detailed the mechanics of Delmarva billing practices. Presumably, the Mall receives a monthly bill which includes the 4.25% tax. The landlord is restricted in passing on to a tenant its share of this bill, as we have discussed above. More particularly, the tax must not be separately charged to the tenant in excess of the tax paid by the landlord. We do not, however, need to consider whether the Mall is a "distributor" under § 5501 or whether, if so, it is in violation of § 5502(b), or even further, if so, whether plaintiff has a private right of action to complain of violation of Chapter 55 of Title 30. The amount which plaintiff can be charged for electricity consumed is governed by 25 *Del. C.* § 5114. If an "inflated tax" is included in the amount that plaintiff is paying to the Mall, § 5114 may have been violated. Plaintiff needs to look no further than § 5114 for a remedy if an excessive charge is being imposed. For this reason, Count II will be dismissed, with the understanding that any unwarranted charge for taxes or otherwise, subsumed therein, will be considered under Count I.

## CONCLUSION

For the reasons stated above, defendants' motion to dismiss Count I is denied. Their motion to dismiss Count II is granted as to paragraphs 43 and 44. However, paragraphs 45 through 47 will not be stricken but will be incorporated into Count I. The reference to Count II, found in paragraph 57 of Count IV will be stricken.

An appropriate order will follow.